UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LINDA GRAVES                                                            PLAINTIFF

v.                                               CIVIL ACTION NO. 3:14-CV-558-DJH

STANDARD INSURANCE COMPANY                                              DEFENDANT

## REPORT AND RECOMMENDATION

This report addresses the motion of Standard Insurance Company to impose sanctions upon Linda Graves and/or her counsel for improper witness contact (DN 27, Mot. for Sanctions). Standard alleges that Graves through her attorney improperly threatened its non-party, expert witness, Dr. Richard Semble, a New York orthopedic surgeon, in an effort to coerce him to withdraw his prior medical opinion that Graves, despite her physical impairments, remains capable of performing sedentary level work - - an opinion relied upon by Standard in its decision to deny her claim for long-term disability benefits[1].

Standard maintains that Graves' attorney wrote to Dr. Semble to advise the doctor that he could avoid a possible lawsuit against him by Graves if the doctor would only execute a sworn statement, provided along with the letter, stating that he abandons his prior medical opinion.  The same letter also suggested that Dr. Semble had engaged in the unauthorized practice of medicine in Kentucky by his mere review of Graves' medical records in the course of providing his professional opinion on her residual functional capacity to engage in substantial gainful activity.

Standard now insists that the conduct of Graves' counsel is nothing less than "illicit witness tampering" intended to deprive Standard of important evidence which was in part the basis of its decision to deny Graves' claim for ongoing disability insurance benefits beyond the

---

[1]  The nature of Graves' claims against Standard and the circumstances that led to the present suit are set forth in the related memorandum opinion of the Magistrate Judge.  The memorandum opinion addresses a series of motions filed by the parties.

initial 2-year payment.  Standard therefore seeks a number of sanctions, including dismissal of the lawsuit, based on the inherent power of the Court, 28 U.S.C. §1927 and the Joint Local Rules for the Eastern and Western Districts of Kentucky, which incorporate the Rules of the Kentucky Supreme Court governing professional conduct.

## A.

The facts that led to the present motion are not genuinely disputed.  On Jan. 13, 2015, Graves filed with the Court a notice of subpoena duces tecum (DN 22, Notice of Subpoena). The subpoena was issued to the records custodial of Dr. Richard Semble, an orthopedic surgeon practicing medicine in Orangeburg, New York.  It requested that Dr. Semble's records custodian produce all documents referring or relating to Linda Graves,

> Including but not limited to draft reports and quality control notes and edits, documents provided for review, reports, computer screen prints, and position qualifications, all contracts, payments, and correspondence with Standard Insurance Co.

(DN 22, Subpoena).

Along with the subpoena, Graves' attorney included a cover letter that requested that Dr. Semble's record custodian produce the requested documents and sign the accompanying affidavit to certify that all responsive documents to the subpoena had been provided (DN 35, Resp. Ex. 1, Grabhorn Letter of Jan. 13, 2015).

On Jan. 22, 2015, Joyce Kelly, the medical records custodian for Dr. Semble's office, sent a letter by facsimile transmission to Graves' attorney (Id., Ex. 2, Kelly Letter of Jan. 22, 2015).  In her letter, Kelly advised Graves' counsel that Kelly had performed a thorough search for the records relating to Linda Graves "and to the best of my knowledge Linda Graves has never been seen in our facility, therefore no records are available."  (Id.).  This letter from Kelly

2

led to an immediate response by Graves' attorney, who on the same date wrote Dr. Semble a second letter (DN 27, Mot. for Sanctions, Ex. A, Grabhorn letter of Jan. 22, 2015).

In this second letter, Graves' attorney first advised Dr. Semble that the subpoena regarding Graves was not limited to those documents obtained from an actual medical examination, but rather included all documents concerning Graves and the doctor's medical opinion about her. Graves' attorney requested that the doctor again review his records in an effort to comply with the subpoena. After this initial paragraph, Graves' counsel continued in his letter as follows:

> Please be aware, Ms. Graves is a Kentucky resident. Any medical opinion concerning Ms. Graves could only be provided by a physician licensed to practice in Kentucky. I will be happy to share the opinions from the Kentucky Board of Medical Licensure applying this requirement to non-examining medical record reviews. I have been unable to locate any license for you to practice in Kentucky. When responding to the subpoena, you should provide supporting documentation of your admission by the Kentucky Board of Medical Licensure.
>
> As an alternative to complying with the subpoena, and to avoid potential claims by Ms. Graves concerning the medical opinion attributed to you, please complete and return the enclosed declaration.

(DN 27, Ex. A, Grabhorn letter of Jan. 22, 2015).

Along with the letter, Graves' counsel included for execution a declaration by the doctor pursuant to 28 U.S.C. §1746, which provided in material part that "upon further consideration, I hereby withdraw my medical opinion concerning the diagnosis, treatment, and prognosis (including restrictions and limitations) of Linda Graves. The medical opinion should *not* be given any consideration or weight." (DN 27, Ex. A, Declaration). Dr. Semble refused to execute the declaration provided by Graves' counsel and did not provide any medical records for Graves.

When Graves' counsel did not receive a response to his Jan. 22 letter, he contacted Dr. Semble's office where he left a voicemail message requesting a return phone call (DN 35, Ex. B,

Grabhorn Aff. , ¶2).  Later that same day a member of the doctor's staff, "Rosie," returned the phone call.  Rosie advised counsel that the doctor would not produce any documents or other information relating to his medical opinions concerning Graves absent a release from Standard (Id., ¶¶3-4).  Rosie also stated that Dr. Semble would not retract his prior medical opinions, nor would he sign the tendered § 1746 declaration to that effect (Id.).  Graves' attorney then cautioned Rosie that Dr. Semble should consult with legal counsel before taking any further action (Id. at ¶5).  Rosie responded that she would so inform the doctor.  Later that same day on Feb. 4, 2015, Standard filed its present motion to impose sanctions against Graves and/or her attorney for witness tampering.

### B.

Graves now characterizes the motion for sanctions as being merely one more "in an unending barrage of motions" filed by Standard (DN 35, Resp. p. 1).  Further, Graves maintains that the motion for sanctions in "its characterization of the facts and the law is not a model of candor."  (Id.).  She insists that her communications with Dr. Semble's office, and in particular her counsel's letter of Jan. 22, 2015, were nothing more than an ordinary pre-litigation demand protected by both the First Amendment and, by analogy, the *Noerr-Pennington* doctrine.  Such pre-litigation demand letters in Graves' view are not only common fare in litigation, but are protected speech.  Under Graves' theory, her letter is merely a settlement demand that Dr. Semble retract his medical opinion in return for Graves' forbearance to pursue her potential claims against the doctor for his "untrue, fraudulent and inflammatory statements."  (DN 35, Resp. pp. 6-7).

4

Graves' reference to "untrue, fraudulent and inflammatory statements," apparently refers to two prior written opinions of the doctor dated Aug. 12, 2013, and Oct. 9, 2013. The doctor in his opinions concludes that based on his review of her medical records Graves remains physically able to perform work at a sedentary exertional level. It is undisputed that no direct communications whatsoever occurred between Graves' counsel and Dr. Semble. It is not alleged that any other "statements" made by Dr. Semble were related to Graves' counsel by the doctor's staff in their discussions with counsel. Accordingly, any potential claims for defamation, civil fraud or tortious interference with contract rest solely on the contents of the two opinions concerning the residual functional capacity of Graves given her physical impairments. Other than her obvious disagreement with the residual functional capacity assessment contained in Dr. Semble's written opinions, Graves offers no explanation how such opinions are in any fashion defamatory, fraudulent or a violation of her contractual rights.

The question for the Court now is whether the Jan. 22, 2015 letter by Graves' counsel to Dr. Semble was prohibited conduct or protected speech. No question exists that attempts to improperly influence witness testimony is considered to be extremely serious misconduct by all courts, state and federal. *Tye v. Softbelly's, Inc.*, 353 F.3d 528, 537 (7th Cir. 2003). Indeed, an unlawful effort to prohibit or otherwise materially influence the prospective testimony of a witness may in certain circumstances constitute a federal criminal offense. *See, United States v. Miller*, 531 F.3d 340, 350-352 (6th Cir.2008) (discussing criminal prosecution under 18 U.S.C. §1512(b) while rejecting the defendant's arguments that he had a legal right to threaten to initiate defamation proceedings against the potential witness) (quoting *Wolfe v. George*, 486 F.3d 1120, 1125 (9th Cir. 2007) ("Just as false statements are not immunized by the First Amendment right

to freedom of speech … baseless litigation is not immunized by the First Amendment right to petition.").

This Court has inherent authority, along with statutory authority under 28 U.S.C. §1927, to impose a wide range of sanctions on a party or its counsel who attempt to improperly influence by unlawful threat, promise or other coercion the future testimony of a potential witness. *See, HomeDirect, Inc. v. H.E.P. Direct, Inc.*, Case No. 10-CA12, 2013 WL 1815979 (N.D. Ill. Apr. 29, 2013) (District court declared the allegations of the complaint to be true and the defendant liable for damages where the CEO of the defendant agreed to forgive certain debt of the plaintiff's key witness in exchange for a written declaration refuting the accusations in the plaintiff's complaint.).

The Joint Local Rules expressly incorporate the Rules of the Kentucky Supreme Court Governing Professional Conduct, which themselves prohibit the destruction or concealment of evidence or efforts to improperly influence witnesses or engage in other obstructive tactics in discovery.  See, Ky.S.Ct. Rule 3.130(3.4)(a) and (g) (A lawyer shall not "unlawfully obstruct another party's access to evidence …" or "request the person other than a client to refrain from voluntarily giving relevant information to another party….").  When such prohibited incidents occur, the federal courts undoubtedly have the inherent power to impose sanctions and to discipline those attorneys involved in such misconduct including the inherent power "to dismiss actions, assess attorneys' fees, and to impose monetary or other sanctions appropriate 'for the conduct which abuses the judicial process.'"  *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir.), *cert. denied*, 510 U.S. 828 (1993) (Efforts by defendant counsel to persuade two treating medical experts for the plaintiff in a medical malpractice suit not to testify because they also might be sued by the plaintiff, and could avoid potential liability by refusing to testify, justified the

imposition of $5,000 in monetary sanctions against defense counsel for his violation of Rule 3.4(a) of the Rules of Professional Conduct.)

Here, no genuine dispute exists that Graves' attorney requested that Dr. Semble withdraw his prior written opinions in which he concluded based on his review of Graves' available medical records that she remained capable of performing alternative work of a sedentary nature despite her limitations.  The letter of Jan. 22, 2015, specifically advises the doctor in the third paragraph that he may avoid certain, unidentified "potential claims" by Graves "concerning the medical opinion attributed to you" if the doctor will execute the declaration that accompanies the letter (DN 27, Mot. for Sanctions, Ex. A, Grabhorn letter of Jan. 22, 2015).

It is likewise undisputed that the declaration, which the doctor refused to execute, provided that he withdraws his medical opinion concerning the diagnosis, treatment and prognosis of Graves, including her restrictions and limitations, while adding that his medical opinion should not be given any consideration or weight (Id.).  The final paragraph of the Jan. 22 letter is a direct threat to pursue litigation against the doctor unless he withdraws his two prior reports.  It therefore cannot be disputed that Graves' attorney is attempting to dissuade Dr. Semble from providing his expert medical reports, both of which were directly relied upon by Standard in its decision to deny Graves' claim for long-term disability benefits.  The only question of importance in light of these circumstances is whether this effort is protected by either the First Amendment right to petition or, by analogy, the *Noerr-Pennington* doctrine, which evolved from antitrust litigation interpreting the Sherman Antitrust Act.

The same fundamental issue is raised by the contents of the second paragraph of the Jan. 22 letter.  This paragraph suggests that because Graves is a Kentucky resident, and Dr. Semble, a New York orthopedic surgeon, is not licensed to practice medicine in Kentucky, "any medical

opinion concerning Ms. Graves could only be provided by a physician licensed to practice in Kentucky." (DN 27, Mot. for Sanctions, Ex. A, Grabhorn letter of Jan. 22, 2015).  The letter continues to imply in the same paragraph that various opinions of the Kentucky Board of Medical Licensure support the view that only a Kentucky licensed physician could offer a medical opinion concerning Ms. Graves.  The paragraph continues to add that Graves' attorney has been unable to locate any license for Dr. Semble to practice medicine in Kentucky, thereby raising the specter that Dr. Semble has unlawfully practiced medicine without a license merely because he had evaluated Graves' medical records in the course of offering an opinion on her residual functional capacity based to perform alternative work.

Once again, we face the same legal question whether this communication, which raises the specter of a potential challenge to Dr. Semble's medical license, is in some fashion protected conduct under either the First Amendment or the *Noerr-Pennington* doctrine.  Several important facts must be kept in mind as we consider this question.  First and most importantly, the assertion that "any medical opinion concerning Ms. Graves can only be provided a physician licensed to practice in Kentucky" was a proposition that Graves' attorney well knew at the time he wrote the Jan. 22 letter had been rejected in two separate Kentucky federal district court opinions.  Indeed, the more recent of the two opinions involved defendant Standard, the same Defendant in the present lawsuit.

The most recent of the two adverse decisions was announced a mere three months prior to the time that Graves' attorney sent the Jan. 22 letter.  Judge Heyburn in a case which involved the current plaintiff's same counsel, *Anderson v. Standard Ins. Co.*, Case No. 3:14-CV-00051-H, 2014 WL 5366117 (W.D. Ky. Oct. 21, 2014), considered the unlicensed medical practice argument.  In *Anderson*, the District Court rejected outright the notion that a physician who

8

conducts a review of a disability claimant's medical file to determine whether the claimant

remains physically capable of performing work is practicing medicine in Kentucky without a

license.  To quote from Judge Heyburn's opinion:

> Anderson cannot rely solely on Standard's use of its own unlicensed
> medical professionals to establish a bad faith claim.  Standard's review did
> not violate the Kentucky Medical Practice Act because its experts were
> not practicing medicine.  There is no allegation that Standard's experts
> could have affected Anderson's medical treatment.  Besides, if this Court
> were to accept Anderson's theory and hold otherwise, then almost every
> disability insurance company investigation would violate the [Kentucky]
> Medical Practice Act because such investigations necessarily require the
> insurer to evaluate the insured's medical condition.  It would be absurd to
> conclude the General Assembly intended such a result when it enacted the
> Medical Practice Act.

*Anderson*, 2014 WL 5366117 at *3 (discussing KRS §311.560).

In reaching its conclusion in *Anderson*, the District Court cited to an earlier federal court

decision in another disability insurance case that also involved Graves' present attorney,

*Hackney v. Lincoln Nat'l Life Ins. Co.*, Case No. 3:12-CV-00170-CRS, 2014 WL 2440691 at

*13-14 (W.D. Ky. May 30, 2014).  In *Hackney*, a separate District Court, Judge Charles R.

Simpson presiding, also rejected the notion that a non-licensed medical professional who renders

an opinion concerning a disability claimant's remaining residual functional capacity is engaged

in the unlawful practice of medicine in Kentucky without a license in violation of KRS

§311.560.  *Id*. at *13.  In rejecting this view, the District Court specifically rejected two opinions

issued by the Kentucky State Board of Medical Licensure, which the plaintiff in *Hackney*

claimed supported the view that medical professionals conducting peer reviews for insurance

companies are practicing medicine within the meaning of KRS §311.560(1).

The District Court in *Hackney* after reviewing the two Licensure Board opinions, held

them to be distinguishable, explaining that:

> In both cases, the review conducted by the non-licensed physician either actually resulted in or could have potentially resulted in a material change to the treatment ultimately received by the insured as a result of the physician's determination regarding the medical necessity of a proposed treatment plan … In contrast to these cases, the unlicensed medical personnel who reviewed Hackney's medical records determined only that his condition did not prevent him from performing the necessary functions of his occupation, and therefore did not express any opinion regarding the medical necessity of any proposed treatment plan.  Because this type of review clearly does not fall within the gamut of the Board opinions relied upon by Hackney, the Board concludes that they are inapposite and thus do not support Hackney's claim that VSI engaged in the unlawful practice of medicine without a license.

*Id*. at *14.  Accordingly, as both *Anderson* and *Hackney* reveal, at the time that Graves' attorney wrote and sent the letter of Jan. 22, 2015, he was aware that not only had two separate federal judges rejected his view concerning the unlicensed practice of medicine under KRS §311.560, but also the District Court in *Hackney* had distinguished the very opinions of the Medical Licensure Board that counsel apparently attempted to rely upon to support his position in paragraph two of the letter.  We take these critical facts into consideration in our determination of whether the Jan. 22, 2015 letter constitutes protected speech under the First Amendment right to petition or by analogy the *Noerr-Pennington* doctrine.

To property consider Graves' argument that her communications with Dr. Semble were protected by either the U.S. Constitution or the *Noerr-Pennington* doctrine we must first appreciate the distinction between the two as they are not synonymous by any means.  The First Amendment includes the right to petition all departments of the Government including the courts.  *See, California Motor Trans. Co. v. Trucking Unlimited*, 40 U.S. 508, 510 (1972).  As noted in *McDonald v. Smith*, 472 U.S. 479, 482 (1985), the right to petition "is implicit in the very idea of government, republican in form."  The right to petition the courts, however, does not give rise to an absolute protection from liability.  *See, Cardtoons, L.C. v. Major League Baseball*

10

*Players Ass'n,* 208 F.3d 885, 891-92 (10ᵗʰ Cir. 2000) (citing *McDonald*, 472 U.S. at 485 ("The right to petition is guaranteed; the right to commit libel with impunity is not.")).

The same First Amendment limitations apply to statements made in a letter that threatens litigation. *Cardtoons*, 208 F.3d at 892 ("[S]tatements made in a letter threatening litigation are not absolutely protected by the petition clause of the First Amendment and are subject to the principles of state common law and state statutory law."). Similarly, no constitutional right exists under the First Amendment right to petition to file frivolous lawsuits. *Wolfe v. George*, 486 F.3d 1120, 1125 (9ᵗʰ Cir. 2007) ("Just as false statements are not immunized by the First Amendment right to freedom of speech … baseless litigation is not immunized by the First Amendment right to petition.") (quoting *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983)). *See also, Miller*, 531 F.3d at 351 (Baseless threat to sue Government witness for defamation solely on the basis of her cooperation with the government irrespective of the veracity of her statements was not protected by the First Amendment as defendant had "no right to institute baseless legal proceedings for the purpose of harassment…."). The right to petition the courts arising under the First Amendment, simply put, is not a license to make false statements or to bring frivolous claims to further an improper purpose.

The *Noerr-Pennington* doctrine is statutory in its origin and involves antitrust litigation arising under the Sherman Antitrust Act. Three Supreme Court cases developed the doctrine. They include *Eastern R.R. President's Conf. v. Noerr Motor Freight*, 365 U.S. 127, 129 (1961), *United Mineworkers v. Pennington*, 381 U.S. 657 (1965), and finally *Calif. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). In *Noerr*, the Supreme Court held that a publicity campaign by a group of railroads directed against competing trucking companies for the purpose of enactment of legislation destructive of the trucking business did not violate the antitrust laws

11

"insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anti-competitive purpose it may have had." *Noerr*, 365 U.S. at 139-40 ("It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.").

Four years later in *Pennington*, the Supreme Court returned to the issue in a case that involved cooperation between union officials and several large coal companies to eliminate competition from smaller coal companies by attempting to persuade the U.S. Secretary of Labor to set a higher minimum wage for companies that sold coal to the Tennessee Valley Authority. *Pennington*, 381 U.S. at 670. After a federal jury returned a verdict in favor of the smaller coal companies on their antitrust claims, the Supreme Court reversed the verdict holding that "joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *Id.* In this regard, the court explained, "Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.*

Seven years later, the Supreme Court returned in *California Motor Transport* to extend immunity from antitrust liability to administrative and judicial processes. The case involved a group of highway motor carriers who allegedly conspired to deter their competitors from obtaining operating rights from the California Public Utilities Commission by opposing every such application regardless of its merits. *Calif. Motor Transport Co.*, 404 U.S. at 511. In rejecting *Noerr-Pennington* immunity for the motor carriers, the Supreme Court explained that the *Noerr-Pennington* doctrine was grounded in the First Amendment rights of association and petition. *Id.*

The Supreme Court in *California Motor Transport* stressed that the doctrine is not one of absolute immunity where the challenged action is "a mere sham to cover what is actually nothing

12

more than an attempt to interfere with business relationships of a competitor [then] …

application of the Sherman Act would be justified." *Calif. Motor Transport*, 404 U.S. at 511.

Efforts to deter competitors from obtaining operating rights from the California Public Utilities

Commission by bringing spurious challenges were not protected conduct, but rather were "a

mere sham to cover what is actually nothing more than an attempt to interfere with business

relationships of a competitor." *Id*. at 511.

      The Supreme Court, however, did not define the parameters of the sham exception in

*California Motor Transport*.  It did, however, indicate that a conclusion of sham activity may

result from a finding of wrongful conduct such as inducing the perjury of a witness, the use of a

patent obtained by fraud, or the bribery of a purchasing agent.  *Id.*  The court added that other

forms of illegal or irreprehensible conduct that might corrupt the administrative or judicial

processes also would fall within the sham exception to the *Noerr-Pennington* Doctrine such as a

pattern of baseless, repetitive claims indicating abuse of the administrative or judicial processes.

*Id*.  The court ultimately concluded that such misconduct could not acquire antitrust immunity

since First Amendment rights may not be used as a means or pretext for achieving "substantial

evils."  *Id.  See, DirectTV, Inc. v. Cavanaugh*, 321 F.Supp.2d 825, 839-41 (E.D. Mich.

2003)(discussing *California Motor Transport* ).

      Although the Supreme Court did not specifically define the sham exception, subsequent

federal case law indicates that the exception applies when a party intends to use the otherwise

protected right to petition merely to improperly harass its opposing party.  *Eaton v. Newport Bd*

*of Ed.*, 975 F.2d 292, 298-99.  A sham situation would involve a party whose activities are not

genuinely aimed at procuring favorable action, but rather are attempted to accomplish an

improper means.  *See, City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380

(1991). To prove that a petition or other action related to a petition is a sham, a party must show that (1) the legal claim ostensibly advanced is an objectively baseless one, and (2) that the petition, or action taken relating to the petition, was subjectively known by the actor to be brought for an improper purpose. *OG Int'l Ltd v. Uvisoft Ent.*, Case No. C11-04980-CRV, 2012 WL 4809174 at *3 (N.D. Cal. Oct. 9, 2012).

A lawsuit or a claim will be considered to be objectively baseless if "no reasonable litigant could reasonably expect success on the merits." *Id*. (citing *Theme Promotions, Inc. v. New America Mktg FSI*, 546 F.3d 991, 1007 (9th Cir. 2008)). The second component of the test for the sham exception to the *Noerr-Pennington* doctrine requires that a showing be made that the litigation, or litigation-related conduct, was not taken sincerely or honestly for the stated purpose, but rather was brought in bad faith in an effort to improperly interfere with the relationship or rights of another by way of baseless legal action or threats of legal action. *See, Matsushita Electronics Corp. v. Loral Corp.*, 974 F. Supp. 345, 355-56 (S.D.N.Y. 1997).

Perhaps the best explanation of this 2-part test for the sham exception to *Noerr-Pennington* Doctrine is set forth by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993), wherein the Supreme Court explains:

> Litigation is a "sham" if it satisfies a two-part test:

>> First, a lawsuit must be objectively baseless so that no reasonable litigant could reasonable expect success on the merits. If an objective litigant could conclude that a lawsuit is reasonably calculated to obtain a favorable outcome, the suit is immunized under *Noerr*, and … a claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's objective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the

> use of the governmental process - - as opposed to the outcome of that process....

*Coumbia Pictures,* 508 U.S. at 60-61.  Further, it is not required that a pattern of such baseless claims exist in order to satisfy the criteria for a sham under *Noerr-Pennington* as even one vexatious or baseless suit, or threat to bring a vexatious or baseless suit, will suffice so long as both prongs of the 2-part test are met.  *See, Aircapital Cablevision, Inc. v. Starlink Communications*, 634 F.Supp. 316, 321 (D. Kan. 1986) ("[I]t appears that a single lawsuit may come within the 'sham exception,' but only if it involves a serious abuse, misuse, or corruption of the judicial process.") (collecting cases).

*Noerr-Pennington* immunity has been extended in certain cases to pre-litigation threats of suit, demand letters and communications about pending suits.  *See, McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558-60 (11th Cir. 1992) (Pre-litigation threats of suit); *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1366-67 (5th Cir. 1983) (same); *Barq's, Inc. v. Barq's Beverages, Inc.*, 677 F. Supp. 449, 453 (E.D. La. 1987); *Aircapital Cablevision, Inc.*, 634 F. Supp. at 324-26.  For the most part, however, the cited cases involve antitrust claims and therefore certain courts are reluctant to apply *Noerr-Pennington* immunity to pre-litigation threats outside the context of antitrust claims.  *See, Cardtoons, L.C.*, 208 F.3d at 889 ("The logical dilemma in applying *Noerr-Pennington* outside of the antitrust context is that *Noerr's* first rationale for immunity - - an interpretation of the Sherman Act - - is not present.  Supreme Court precedent gives us scant guidance in resolving this issue.  All of the cases in which the Supreme Court has applied *Noerr-Pennington* immunity as such have involved antitrust claims." *Id.* (collecting cases).

We assume to the benefit of Graves that *Noerr-Pennington* immunity applies outside the context of antitrust litigation to pre-suit communications involving threats of litigation such as

the Jan. 22, 2015 letter sent by Graves' counsel.  This assumption does little to benefit Graves, however, given the nature of the letter's contents.  Neither the First Amendment right to petition nor the *Noerr-Pennington* doctrine protect Graves or her counsel from sanctions given the contents of the letter.  Graves' counsel could not have been unaware at the time that he drafted and transmitted the Jan. 22 letter that his claim regarding the unlicensed practice of medicine in violation of KRS § 311.560 had been rejected on its merits in two prior disability lawsuits brought by him.  The District Court in both *Anderson* and *Hackney* directly put present counsel on notice that KRS § 311.560 is not violated when a physician or other medical services provider not licensed in Kentucky renders an opinion about a disability claimant's residual functional capacity based upon a review of the claimant's medical records.

Further, not only was counsel obviously aware of the adverse opinions in *Anderson* and *Hackney*, he certainly could not have overlooked the fact that in *Hackney*, the District Court rejected the very opinions of the Kentucky Medical Licensure Board that counsel cited, without specifically identifying, in his Jan. 22 letter to Dr. Semble.  Thus, counsel was subjectively aware that the allegation of unlawful practice of medicine without a license was entirely baseless given *Anderson* and *Hackney*.  The only reason for including this paragraph in the letter was an overt attempt to intimidate Dr. Semble so as to persuade him to execute the declaration withdrawing his prior written opinions that Graves remained capable of performing sedentary work.  Consequently, both prongs of the sham exception the *Noerr-Pennington* doctrine are satisfied so that even if the doctrine does apply outside the context of antitrust litigation, it offers no sanctuary to Graves or her counsel.

The First Amendment provides no more protection than the *Noerr-Pennington* doctrine.  The First Amendment right to petition does not protect baseless threats to bring frivolous

accusations.  *Miller*, 531 F.3d at 351 ("There is no constitutional right to file frivolous

litigation.") (citing *Wolfe*, 486 F.3d at 1125 ("[B]aseless litigation is not immunized by the First

Amendment right to petition.").  Graves' counsel therefore knowingly raised the prospect of a

frivolous claim of practicing medicine without a license with the subjective intent to force the

disclosed expert witness for an adverse party, Dr. Semble, to withdraw an unfavorable opinion.[2]

Aside from the implicit threat of a claim for practicing medicine in Kentucky without a

license, Graves' counsel in the final substantive paragraph of the Jan. 22 letter urges Dr. Semble

to complete the declaration renouncing his prior medical opinions "as an alternative to

complying with the subpoena, and to avoid potential claims by Ms. Graves concerning the

medical opinion attributed to you…." (DN 27, Mot. for Sanctions, Ex. A). Nowhere in the letter

itself does counsel identify the nature of such "potential claims" related to Dr. Semble's medical

opinion.[2]

Attached to the letter is a copy of the Physician Consultative Memo prepared by Dr.

Semble on Oct. 2, 2013, concerning Linda Graves.  (Id.).  The consultant memo contains two

sections-- a "review of medical records" section in which the doctor reviews Graves' available

treatment records, and a "response to questions" section in which the doctor offers his

professional opinion, based upon those same treatment records, that Graves retains the capacity

to perform sedentary work - - work that involves lifting up to 10 lbs. occasionally with 4-6 hours

---

[2] The Court observes that Graves' counsel has previously brought suit against two registered nurses, Jo Ellen Jacobson and Kem Alan Lockhart, accusing both individuals of practicing medicine without a license in violation of KRS 311.560 for their role in providing case review for their employer LINA, which resulted in the denial of disability benefits to Violet Hogan.  *See, Hogan v. Jacobson, et al.*, Case No. 3:12-CV-00820-DJH-CHL (W.D. Ky. 2012).  Graves' counsel brought this lawsuit, referred to as *Hogan II*, after unsuccessfully suing LINA for its denial of disability benefits to the same claimant in *Hogan v. Life Ins. Co. of North Amer.*, Case No. 3:11-CV-67-H ("*Hogan I*").  A motion for the imposition of Rule 11 sanctions against Graves' counsel was filed in *Hogan II* based on the claim that filing the second suit, after the unsuccessful action in *Hogan I*, was unreasonable vexatious and abusive where counsel had unsuccessfully raised the same claims of unlicensed practice of medicine in Kentucky in the prior suit. (DN 38, Memo. and Opin.).  The court remanded the motion for sanctions, with leave to reinstate, following adjudication on the merits.  (*Id.*)  The court dismissed the action for failure to state a claim on April 28, 2015.  No further motions were made to revive the request for sanctions.

of sitting and 2 hours each of standing or walking on an average workday.  (Id., Physician Consultant Memo, p. 2).  The same section contains Dr. Semble's opinion that it is unlikely that there will be marked or fundamental change in Graves' condition "as it does not appear that the claimant is receiving any active treatment."  (Id.).

Graves' counsel repeatedly characterizes these two opinions of Dr. Semble as being "untrue, fraudulent and ultimately defamatory."  (DN 35, Resp. p. 4, 5, 6).  Graves in her response offers no explanation of the improper nature of Dr. Semble's opinions.  While she obviously disagrees that she retains the residual functional capacity to perform sedentary work, her disagreement appears at this point to be the only basis for her potential claims for fraud, defamation and tortious interference with contract.  The Court is at a loss to find a colorable basis for any of these claims in the contents of Dr. Semble's Physician Consultant Memo of Oct. 2, 2013.

A claim for defamation in Kentucky requires that there be defamatory language about the plaintiff which is published and which causes injury to the plaintiff's reputation.  *Smith v. Martin*, 331 S.W.3d 637, 640 (Ky. App. 2011) (citing *Stringer v. Wal-Mart Stores, Inc.*, 151F.3d 781, 793 (Ky. 2004)).  *See also, Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273-74 (Ky. App. 1981) (discussing the four elements necessary to establish a defamation action).  Here, there appears to be nothing on the face of Dr. Semble's consultant memo of Oct. 2, 2013, that would support a colorable claim for defamation under Kentucky law.

Graves offers no explanation of what aspect of the doctor's opinion is false and defamatory.  Absent some untrue statement, the mere existence of an opinion that Graves obviously disagrees with is hardly the basis for a colorable claim of defamation.  Graves clearly believes that she is precluded from all substantial gainful activity by her functional limitations.

Dr. Semble based on his review of her medical records apparently disagrees.  This disagreement in and of itself cannot support an action for defamation.  Graves' suggestion in her response to the contrary is meritless.  *See, Miller*, 531 F.3d at 351 (threat to sue potential witness for defamation without regard to the veracity of her statements justified defendant's federal conviction for witness tampering).

We likewise see no apparent basis on the face of Dr. Semble's memo, or in Graves' response for that matter, on which to raise a colorable civil claim of fraud.  Fraud requires that there be an intentional assertion of false information or a willful failure to disclose the truth. *United Parcel Svc v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999).  A party who hopes to recover on a civil claim for fraud must establish six elements by clear and convincing evidence: (1) material misrepresentation; (2) which is false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) action in reliance thereon; and (6) resultant injury.  *Pezzarossi v. Nutt*, 382 S.W.3d 417, 419-20 (Ky. App. 2012) (citing *Rickert*, 996 SW.2d at 468).  *See also, Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. App. 1978).

Fraud is not an accusation to be lightly made.  It must be established by clear and convincing evidence and raised in a complaint that sets forth the nature of the alleged fraud with particularity.  A mere disagreement of opinion can hardly be characterized as fraud.  A number of state court decisions from various states confirm this commonsense proposition.  *Island Mill Lumber v. City of Alpena,* 142 N.W. 770, 780 (Mich. 1913) (property value assessment was not fraudulent merely because the property owner disagreed with the amount assessed); *Gonzales v. State*, 81 S.W.2d 180, 181 (Tex. Civ. App. 1935) (A mere difference of opinion as to the reasonableness of the valuation of property would not support a claim for fraud); *Columbia Mut. Life Ins. Co. v. Craft*, 185 So. 225, 227-28 (Miss. 1938) (An honest difference of opinion as to

the liability of the defendant insurance company to pay disability benefits did not constitute fraudulent concealment or willful misrepresentation so as to extend the statute of limitations).

While the present case does not involve a dispute over the valuation of property, the underlying principle remains the same.  A disagreement over the conclusions of an expert concerning an individual's residual functional capacity, standing alone, is insufficient to support a colorable claim of fraud.  Graves in her response sets forth no factual basis to support such a serious claim against Dr. Semble.  We therefore conclude that no objective basis exists on which to raise such a claim.

Graves potential claim for tortious interference with contract fairs no better.  Graves must prove six elements to succeed on her suggested claim of tortious interference with a prospective business advantage: (1) the existence of a valid business relationship or expectancy, (2) that the defendant was aware of this relationship or expectancy, (3) that the defendant intentionally interfered, (4) that the motive behind the interference was improper, (5) causation, and (6) special damages. *Snow Pallet, Inc. v. Monticello Banking Co*., 367 S.W.3d 1, 6 (Ky. App. 2012). The viability of such a claim turns on the existence of improper motive. *Id*. (citing *Nat'l Collegiate Athletic Ass'n ex rel. Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 859 (Ky 1988)). "[I]t is clear that to prevail a party seeking recovery must show malice or some significantly wrongful conduct." *Hornung*, 745 S.W.2d at 859.

Graves has not suggested, much less established, any malice or wrongful conduct by Dr. Semble based on his two adverse opinions, nor has she explained how providing a medical opinion to Standard for consideration in its determination of her disability claim somehow interfered with her alleged "contractual right" presumably to a successful application for benefits.  Graves had no such right and the actions of the doctor in providing the two medical

20

opinions were taken in furtherance of Standard's own contractual obligation to administratively process and decide Graves' disability application under the "any occupation" standard.

Graves' counsel acted with the subjective intent to improperly coerce Dr. Semble to withdraw his adverse opinions by suggesting the possibility of litigation when no reasonable basis existed on which to pursue claims of defamation, fraud or tortious interference with contract. Once again, the sham exception to the *Noerr-Pennington* doctrine applies to the extent that doctrine itself applies outside the context of antitrust litigation. Graves and her counsel therefore are not protected from the consequences of their actions related to the letter of Jan. 22, 2015.

A litigant who faces the prospect of an adverse expert opinion ordinarily would challenge that opinion on its substance through the vehicle of obtaining his or her own favorable expert opinion, or by cross-examination of the adverse expert to determine the factual basis for the adverse opinion. Likewise, a litigant who was dissatisfied with the response to a subpoena duces tecum by a potential witness ordinarily would seek to enforce the subpoena by way of a motion to compel. A responsible litigant would not bring baseless threats of legal action against the potential expert witness in a misguided effort to intimidate the witness to withdraw the unfavorable opinion. Such a course of action is not constitutionally protected under the First Amendment right to petition or by analogy the *Noerr-Pennington* doctrine.

The only question remaining in the Court's mind is the type of sanction or sanctions to be imposed. Standard has requested sanctions to include dismissal of the action, exclusion of Plaintiff's evidence, and an award of its costs and attorney fees. The requested dismissal of Graves' lawsuit is an overly harsh and inappropriate sanction although other courts indeed have dismissed lawsuits for just such conduct. There is no indication that Graves had any knowledge

or, much less involvement in, the correspondence of Jan. 22, 2015, by her attorney.  To prevent her from pursuing her current claims is to visit a penalty upon her that is excessive and undeserved.  Yet, some sanction is warranted.

The requested evidentiary sanctions are also too severe, absent any proof of Ms. Graves' involvement and are not recommended to the District Court.  More appropriate, however, is to impose the costs of the present motion upon counsel for the Plaintiff.  The present motion for sanctions is purely the result of counsel's improper conduct and bad faith in the sending of the subject correspondence to Dr. Semble.  Mr. Grabhorn therefore should bear the full cost directly attributable to Standard's motion to impose sanctions.  Clearly, any similar conduct in the future will warrant more severe sanctions.

## RECOMMENDATION

It is recommended that motion for imposition of sanctions be granted to the extent set forth above and that Standard file with the Court an itemized bill of costs setting forth its reasonable and necessary costs and fees attributable to the present motion.  The bill of costs should identify those individuals who provided legal services in the preparation and filing of the motion for sanctions, their title, their hourly rate for legal services, and the number of hours worked, with a brief description of the services performed.  The bill of costs should be filed and served on Graves' counsel **within 20 days** of the entry of the present report and recommendation, or any order that affirms it over objection should either party file timely objections pursuant to Rule 72(b).  Graves' counsel may file a response **within 20 days** thereafter, at which time the matter of monetary sanctions will stand submitted.

**NOTICE**

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived.  Thomas v. Arn, 474 U.S. 140, 150-51 (1985); 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)

Cc:     Counsel of Record